In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3110

Barbecue Marx, Incorporated,

Plaintiff-Appellee,

v.

551 Ogden, Incorporated,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 3433--Elaine E. Bucklo, Judge.

Argued November 7, 2000--Decided December 22, 2000

Before Bauer, Coffey, and Easterbrook, Circuit Judges.

Bauer, Circuit Judge.  Barbecue Marx, Inc.
("Barbecue Marx"), owner of the barbecue
restaurant SMOKE DADDY, sued for trademark
infringement to prevent 551 Ogden, Inc. ("Ogden")
from using the name "BONE DADDY" for its
forthcoming barbecue restaurant. Barbecue Marx
petitioned the district court for a preliminary
injunction to prevent Ogden from using BONE DADDY
while the underlying case was pending. The
district court granted the preliminary injunction
and Ogden now appeals. We reverse and remand.

I.  Background

Max Brumbach, a former musician, created the
restaurant SMOKE DADDY and its parent
corporation, Barbecue Marx. SMOKE DADDY, founded
in 1994, is located on the Near West side of
Chicago and features live music, mostly blues.
The diner style, 1500 square foot restaurant
seats 42 people. SMOKE DADDY's logo features the
words "SMOKE DADDY" sitting atop a pair of wings
and smoke. Its slogans are "Wow," and "Wow, that
sauce!" By all accounts, SMOKE DADDY is a
successful restaurant. Not only does it make a
tidy profit, but food critics have recognized it
as one of the best barbecue restaurants in
Chicago. While a substantial number of SMOKE
DADDY's customers come from the neighborhood in
which it is located, it attracts some customers

from other areas of the city and country. SMOKE DADDY initially advertised, but it now relies on word of mouth and restaurant reviews to attract new customers.

Clifford and Mitchell Einhorn, the principles of Ogden, own the critically acclaimed restaurant the Twisted Spoke. The Twisted Spoke features an "irreverent" style; the restaurant has a biker theme and shows X-rated videos. In 1996, the Einhorns decided to open a barbecue restaurant. When they began to develop the restaurant's concept, they fell back upon a name that Mitchell Einhorn initially hit upon in 1993: BONE DADDY. Einhorn was inspired by the movie The Nightmare Before Christmas, in which one character asks a drum-playing skeleton, "What's up, bone-daddy?" By the time the Einhorns decided to use the name for their new restaurant, however, they were aware of SMOKE DADDY and had eaten there several times.

The Einhorns chose to locate BONE DADDY a few blocks from the Twisted Spoke, and 1.4 miles away from SMOKE DADDY. They consulted a trademark attorney, not regarding the appropriateness of the name, but to register it as a trademark. BONE DADDY hired consultants to create an image and logo for the restaurant as well as contractors to prepare the restaurant space. The BONE DADDY logo features a pig dressed like a gangster, smoking a cigar and the words "BONE DADDY." Its slogans are sexually charged: "Ribbed for your Pleasure" and "Man, I boned a lot of pigs." The 5000 square foot restaurant features a bar and two dining rooms, decorated in a modern style. BONE DADDY plans to feature live entertainment, including bluegrass, acoustic, and adult oriented musicians, but does not plan to have blues performers. BONE DADDY has not yet opened,/1 but it planned to begin doing business in September or October of this year. In anticipation of BONE DADDY's opening, the Einhorns publicized the restaurant on the summer menus at the Twisted Spoke.

II.  Discussion

Of the five elements necessary to obtain a preliminary injunction, see Rust Env't & Infrastructure Inc. v. Teunissen, 131 F.3d 1210, 1213 (7th Cir. 1997) (listing the elements of proof for a preliminary injunction), we focus on the threshold issue of whether Barbecue Marx has proven a reasonable likelihood of success on the merits. In a trademark infringement suit, the plaintiff must show that its mark is protected under the Lanham Act and that the challenged mark is likely to cause confusion among consumers. See Eli Lilly & Co. v. Natural Answers, Inc., No. 00-

1375, 2000 WL 1735075, at *6 (7th Cir. Nov. 21, 2000) (citations omitted); Platinum Home Mortg. Corp. v. Platinum Fin. Group Inc., 149 F.3d 722, 726 (7th Cir. 1998) (citation omitted). In this case, Ogden accepts that SMOKE DADDY is a protectable mark. However, it argues that the preliminary injunction was granted in error because Barbecue Marx did not meet its burden of proof with regard to the likelihood of confusion.

To justify a preliminary injunction against a junior trademark, Barbecue Marx must show a greater than negligible chance of prevailing on the merits of the underlying infringement claim. See Platinum Home Mortg. Corp., 149 F.3d at 726 (citing Curtis v. Thompson, 840 F.2d 1291, 1296 (7th Cir. 1988)). Seven factors comprise the likelihood of confusion test: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant to 'palm off his product as that of another.'" Rust Env't & Infrastructure Inc., 131 F.3d at 1216 (7th Cir. 1997) (citations omitted); see Smith Fiberglass Prods., Inc. v. Ameron, Inc., 7 F.3d 1327, 1329 (7th Cir. 1993) (citations omitted); Schwinn Bicycle Co. v. Ross Bicycles, Inc., 870 F.2d 1176, 1185 (7th Cir. 1989) (citations omitted). Likelihood of confusion is a factual determination, and we will defer to the district court unless we find clear error. See Platinum Home Mortg. Corp., 149 F.3d at 726; August Storck K.G. v. Nabisco, Inc., 59 F.3d 616, 618 (7th Cir. 1995). Clear error exists if, based on the whole record, we are left with a firm conviction that the district court has made a mistake. See Rust Env't & Infrastructure Inc., 131 F.3d at 1216 (citation omitted).

The likelihood of confusion test is an equitable balancing test. While no single factor is dispositive, see Schwinn Bicycle Co., 870 F.2d at 1187, and courts may assign varying weights to each of the factors in different cases, see Smith Fiberglass Prods. Inc., 7 F.3d at 1329 (citation omitted), three of the factors are particularly important: the similarity of the marks, the defendant's intent, and actual confusion, Eli Lilly & Co., 2000 WL 1735075, at *3.

In determining whether to grant a preliminary injunction, the district court must weigh the evidence pertaining to each likelihood of confusion factor and balance the seven factors against each other. A preliminary injunction is a very serious remedy, "'never to be indulged in except in a case clearly demanding it.'" Schwinn

Bicycle Co., 870 F.2d at 1184 (quoting Roland Mach. Co. v. Dresser Indus., 749 F.2d 380, 389 (7th Cir. 1984) (italics omitted)). When a district court evaluates the likelihood of confusion, "the actual and reasoned weighing of the evidence is imperative and is inherent in a meaningful exercise of discretion[,]" Schwinn Bicycle, 870 F.2d at 1184, as is the explicit balancing of the test's factors. The district court's opinion, however, does not explain how the evidence was weighed or how the factors were balanced. As a consequence, we do not have the district court's rationale before us, making our review for clear error significantly more difficult. We now turn to the likelihood of confusion test.

### A. Similarity in Appearance and Suggestion

The trial court focused most heavily on the first factor, finding that the BONE DADDY and SMOKE DADDY marks were confusingly similar in appearance and suggestion. The district court based its finding on the tonal similarities of the words "bone" and "smoke." Both words have a long "o" and are only one syllable long. Further, the district court found that both marks evoke images of "slow cooked, smoked barbecue, usually ribs on the bone." We agree that the words sound alike and evoke similar imagery. However, the district court did not discuss the impact of the written form of the marks.

SMOKE DADDY's rectangular mark depicts the words "SMOKE DADDY" on top of a pair of wings and smoke. In contrast, BONE DADDY's mark prominently displays a pig clad like a gangster and the words "BONE DADDY." The marks are visually distinct. Because the public will encounter the marks in written as well as spoken form, we believe it is essential to consider the marks' visual characteristics. The visual appearance significantly undercuts the strength of Barbecue Marx's argument that the marks are similar in appearance and suggestion. However, because of the aural similarity between the marks, we find no clear error with regard to this factor.

### B. Similarity of Products

The second factor is the similarity of the products. The district court addressed the second factor by noting that both SMOKE DADDY and BONE DADDY serve, or plan to serve, the same product: barbecue. This is true. However, the record contains evidence of differences in the restaurants' ambiances and themes. SMOKE DADDY, a small restaurant, seating only 42, and

decorated in a 1950s style, focuses heavily on blues music. In contrast, BONE DADDY styles itself as an "irreverent" restaurant, using such sexually charged slogans as "ribbed for your pleasure" and "man, I boned a lot of pigs." This style closely mirrors that of the Twisted Spoke. BONE DADDY's interior has a very different feel, and its stronger emphasis on food differentiates its style from that of SMOKE DADDY. Although the district court did not consider this evidence, we cannot conclude that the judge's finding on the similarity of products factor constituted clear error, but it certainly weakens this factor's strength in favor of Barbecue Marx in the final weighing of the factors.

## C. Area and Manner of Concurrent Use

The district court weighed the third factor, area and manner of concurrent use, in favor of Barbecue Marx. The court emphasized that BONE DADDY and SMOKE DADDY are located generally in the same neighborhood because they are 1.4 miles apart and may serve many of the same customers. In this case, however, context is key. SMOKE DADDY is located in Wicker Park and BONE DADDY is situated in River West. These neighborhoods are in the heart of Chicago. In such a densely populated area, 1.4 miles is quite a distance, especially in an area crowded with dozens of restaurants, as these neighborhoods are. We find that the district court committed clear error when it weighed this factor in favor of Barbecue Marx.

## D. Degree of Care Likely to be Exercised by Consumers

The district court also weighed the fourth factor, degree of care likely to be exercised by consumers, in favor of Barbecue Marx. We believe this is clear error. The district court based its finding on the idea that "although a careful patron might look up the address, write it down, and follow directions, some others might hop in the cab or car and wing it--perhaps to the wrong restaurant." There is little convincing evidence on the record to support this conclusion. Barbecue Marx argues that many people do not consider a $20 dinner expensive, and may forget the precise name of a restaurant recommended to them. These arguments are not persuasive. Reviews by food critics show that SMOKE DADDY is a critically acclaimed restaurant. The record reflects that most of SMOKE DADDY's customers are "barbecue afficionados." We can expect that customers will exercise a reasonable degree of care when planning to dine at a restaurant of SMOKE DADDY's caliber. Therefore, we find that it

was clear error for the district court to weight this factor in favor of Barbecue Marx.

E.  Strength of Ogden's Mark

The district court does not address the strength of Barbecue Marx's mark. We believe this factor should be weighed in favor of Barbecue Marx. Barbecue Marx has used the mark SMOKE DADDY for six years and has built a reputation for good barbecue, as its rave reviews in restaurant guides and ability to depend on word-of-mouth advertising demonstrate.

F.  Actual Confusion

The sixth factor is actual confusion. The complainant does not have to prove this element with evidence of actual confusion, but must provide some type of evidence. See Libman Co. v. Vining Industries, Inc., 69 F.3d 1360, 1363 (7th Cir. 1995) ("But our point is only that a finding of likely confusion can no more be based on pure conjecture or a fetching narrative alone than any other finding on an issue on which the proponent bears the burden of proof."). Because BONE DADDY has not yet opened its doors, it would be exceedingly difficult for Barbecue Marx to find evidence of actual confusion. However, this difficulty does not excuse Barbecue Marx from the requirement that it must provide some evidence if the court is to weigh this factor in favor of Barbecue Marx. See Eli Lilly & Co., 2000 WL 1735075, at *6. Barbecue Marx could have conducted a survey using a hypothetical question asking would-be consumers to compare the two restaurants. It could have solicited testimony from an expert in marketing or psychology. Because the record contains no evidence to support a finding in favor of Barbecue Marx on the actual confusion factor, we conclude that the district court committed clear error when it weighed this factor in favor of Barbecue Marx.

G.  Intent to Palm Off the Product as that of Another

The last factor is the intent of the defendant to palm off the product as that of another. The district court addressed this factor by noting in its recitation of the facts that BONE DADDY's creators knew of the name's similarity to SMOKE DADDY before they began planning to open BONE DADDY. The district court, however, did not consider this factor in its balancing. The record shows that Ogden derived the inspiration for the name BONE DADDY from the animated film The Nightmare Before Christmas. Ogden admits that its

owners had eaten at SMOKE DADDY before they acted on the BONE DADDY concept and discussed the similarity of the two names. However, this knowledge alone is not enough to show intent on the part of Ogden. Ogden advertised the forthcoming opening of BONE DADDY at its other restaurant, the Twisted Spoke. BONE DADDY's planned "irreverent" atmosphere mirrors the reputation of the Twisted Spoke, a "family biker bar" which shows X-rated videos, more closely than it does that of SMOKE DADDY. Further, it is relevant to note that BONE DADDY's location is closer to the Twisted Spoke than it is to SMOKE DADDY, neutralizing an inference of bad intent that could be derived from the proximity of BONE DADDY to SMOKE DADDY. Given the evidence on the record, we conclude that this factor supports Ogden's argument against the preliminary injunction.

## H. Balancing the Factors

Upon considering each of the factors, we believe that there is not enough evidence on the record to support a preliminary injunction. The key factors in this case are lack of evidence regarding Ogden's intent and actual confusion on the part of consumers, and a reasonably high level of customer care. These factors strongly militate against imposing a preliminary injunction. Barbecue Marx's showing that it has a strong mark, and the relatively weak showing in Barbecue Marx's favor of similar products and similar marks cannot fill enough of the evidentiary void to justify a preliminary injunction.

## III. Conclusion

Because the record does not establish that Barbecue Marx has a more than negligible chance of prevailing on the merits, we REVERSE the judgment and REMAND for further proceedings not inconsistent with the views expressed herein.

/1 Since oral argument, the Einhorns have opened their barbecue restaurant under the appellation "The Rib Restaurant Without a Name."