In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3067

JEFFREY SORENSEN,

*Plaintiff-Appellant,*

*v.*

WD-40 COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 12-cv-50417 — **Frederick J. Kapala**, *Judge.*

ARGUED FEBRUARY 25, 2015 — DECIDED JUNE 11, 2015

Before BAUER, FLAUM, and MANION, *Circuit Judges.*

FLAUM, *Circuit Judge.* Plaintiff Jeffrey Sorensen is the
founder and CEO of Inhibitor Technology Corporation,
which produces a line of rust-inhibiting products containing
a substance called volatile corrosion inhibitor ("VCI"). This
line of products is branded with the federally registered
trademark THE INHIBITOR. That word mark is owned by
Sorensen; he also claims common law trademark rights in a

design mark associated with his products, an orange-and-black crosshair.

In 2011, the WD-40 Company, the well-known maker of spray lubricant, introduced a new sub-brand of products known as the WD-40 Specialist product line. According to Sorensen, the branding for these products infringes upon his marks. In particular, one of the WD-40 products—WD-40 Specialist Long-Term Corrosion Inhibitor, which contains VCI and has a purpose similar to that of Sorensen's products—contains on its packaging both the word "inhibitor" and an orange crosshair. So, Sorensen filed suit against WD-40 in the Northern District of Illinois, alleging trademark infringement and unfair competition under both federal and Illinois law.

The district court granted summary judgment in favor of WD-40 on all counts. It found that WD-40's use of the word "inhibitor" on the label of WD-40 Specialist Long-Term Corrosion Inhibitor was a non-trademark descriptive fair use of the word. As to the crosshair mark, the district court found that Sorensen had not presented sufficient evidence to demonstrate a genuine issue of material fact as to a likelihood of confusion. Sorensen appeals the grant of summary judgment. We affirm the judgment of the district court.

## I. Background

In 1997, Jeffrey Sorensen founded a company called Van Patten Industries and began selling rust preventative products under the name THE INHIBITOR. That company existed until 2010. Now, Sorensen is the CEO of Inhibitor Technology Corporation, which he founded and which continues to sell THE INHIBITOR line of products. These products

contain VCI, which prevents corrosion by creating a chemical barrier on materials that repels moisture and water.

Sorensen claims to own two trademarks related to his line of products. First, he is the owner of the word mark THE INHIBITOR, which was registered on the United States Patent and Trademark Office's Principal Register on August 6, 2002. *See* THE INHIBITOR, Registration No. 2,604,283. That mark attained incontestable status in August 2008. Second, Sorensen claims ownership of a common law (i.e., unregistered) trademark in a crosshair design, which consists of a black crosshair symbol over an orange background, with a different black symbol in each quadrant of the crosshair (the "Sorensen crosshair").[1] The district court assumed without deciding that these marks were valid and protectable.

Sorensen sells a variety of products using these marks, including "plugs," "pro chips," spray oil, oil wipes, grease, degreaser, covers, "poly bags," "VCI paper," and wiping cloths, all of which contain VCI. The words THE INHIBITOR appear consistently on all of these products. The crosshair design mark, however, appears on only some of his products, and its appearance is inconsistent. For example, on the VCI Pro Chips and the V80 VCI Wiping Cloth—among others—there is no crosshair, but rather only an orange-and-black bull's-eye that replaces the "O" in a stylized THE INHIBITOR logo. But on the V80 VCI Oil Blend and the V80

---

[1] Below, Sorensen also argued that he owned a third, unregistered, trademark in the "inhibitor design mark," which is a stylized version of THE INHIBITOR in which the "O" has been replaced with the crosshair design mark. Sorensen's briefs on appeal do not mention this mark, however, so we do not discuss it further.

VCI Oil Wipe, the crosshair mark appears both on its own and as the "O" in THE INHIBITOR.



**Items in THE INHIBITOR Line**

Sorensen generally targets his sales at firearm, fishing, and hunting enthusiasts, as well as members of the military. Until 2008, he promoted his products in various hunting and fishing print and online media; since then, he has used Facebook and his website as his primary methods of advertising. Sorensen also promotes his products at trade shows and by word of mouth. Since July 2012, his chips and plugs have been sold in the tools, storage, and tool box sections of

Menards retail stores in the Midwest. In his deposition, Sorensen also stated that he was working on getting his oil products into Menards, but has not yet done so. He also said that his products are sold in other big box stores and smaller hardware stores across the country.




**Sorensen Crosshair**            **WD-40 Crosshair**

WD-40 is a well-known producer of multipurpose lubricant spray. Its primary product carries a trademark consisting of a yellow shield bearing the name "WD-40" in blue characters. According to a survey conducted by the company and submitted into the record, four out of five Americans have used WD-40 products. In late 2011, WD-40 introduced a sub-brand called the WD-40 Specialist product line. There are eight products in this line. With one exception, they all come in metal aerosol spray bottles with the WD-40 shield above the trademarked SPECIALIST mark. Below that is the specific product's name, such as "Long-Term Corrosion Inhibitor," and below that is the crosshair design that is at issue in this suit (the "WD-40 crosshair").

WD-40 obtained a registered design mark in a simple black-and-white crosshair design. On the bottles, though, the

WD-40 crosshair appears differently on each product. For example, on the Long-Term Corrosion Inhibitor, the crosshair is made of a gray cross over a burnt orange background, with a black circle perimeter and a different silver-black symbol in each quadrant of the crosshair. The background color and symbols are different on each of the Specialist products. Because of its orange crosshair and its name, the Long-Term Corrosion Inhibitor is of central importance to this case. That product is also important because of its ingredients and function; it contains VCI and is meant to inhibit rust for a long period of time. According to WD-40, in marketing its Specialist products, the company focuses on tradesmen, industrial consumers, auto consumers, construction workers, and maintenance workers, with the greatest focus on the auto industry. The Specialist products are promoted in numerous print and online media, none of which overlap with the media in which Sorensen's products have been advertised.



**WD-40 Specialist Line**



**WD-40 Specialist Long-Term Corrosion Inhibitor**

WD-40's decision to develop the Specialist line was led by an executive named Graham Milner, who headed a group called the Brand Extension Exploration Project. At his deposition, Milner denied that WD-40 ever considered forming a partnership with Sorensen's company. However, a document produced for WD-40 by an outside consulting group, Innovation Edge, suggested the possibility of WD-40 forming a partnership with one of five firms to produce a new corrosion inhibition product; one of the five firms mentioned was Van Patten Industries, Sorensen's former company. Milner stated that his team first became aware of Van Patten as a potential technology provider when he received this document in 2009 or 2010. Milner also said that he was aware of Van Patten before WD-40's decision to use the name "Long-Term Corrosion Inhibitor," but he denied any knowledge of Sorensen's crosshair design mark. According to Milner, WD-40's marketing for the Specialist line focuses on mechanics and other professional users, but not the hunting or fishing industry.

Milner also testified that WD-40 had considered using other names for this product, including "corrosion-preventing spray," "advanced corrosion preventer," and "rust-preventing spray." According to Milner, the name Long-Term Corrosion Inhibitor was chosen due to findings by an outside research agency. The district court found that there are multiple products on the market containing VCI and displaying the word "inhibitor" that are not manufactured or sold by either party to this case. The WD-40 crosshair design was created by ECHO Brand Design, a London-based firm. WD-40 adopted the design after testing it with consumers.

Another WD-40 executive, Maria Mitchell, was also deposed. She testified that she had never heard of Sorensen, Van Patten, or THE INHIBITOR products prior to the filing of this suit. At her deposition, Mitchell identified a 10-page document generated by Innovation Edge entitled "Executive Summary," which WD-40 had produced in discovery and which reads: "The resulting product [WD-40's VCI spray] may have some characteristics related to, for example, … Inhibitor® VCI technology from Van Patten Industries." Mitchell admitted that the document indicated that WD-40 had knowledge of Van Patten and The Inhibitor line of products but she did not know when WD-40 came into possession of the document.

Cheryl Perkins, the founder of Innovation Edge, was also deposed. She described the making of that Executive Summary, and acknowledged an email sent by Innovation Edge to WD-40 that listed Van Patten as a prospective partner for VCI technology development. Another document, "Conceptual Ideas Presented to Innovationedge, LLC," was created

by Innovation Edge and sent to individuals at WD-40 in early 2010. That document includes a reference to Van Patten as a possible partner, as does another document sent from Innovation Edge to WD-40 called "WD-40 Brand Extension Exploration Project Business Case-Corrosion Products." Perkins stated that Innovation Edge never incorporated any of Sorensen's products into any presentation or document provided to WD-40, and that she had never visited Sorensen's website, though the website address was referred to in a document produced by Innovation Edge. Perkins explained that someone else at Innovation Edge had reviewed the website prior to the preparation of that document. Innovation Edge did not participate in the design of the packaging or labels for the Specialist line and did not suggest the use of the word "inhibitor" or the crosshair design.

Nicholas Dormon, the managing director and co-owner of ECHO, the firm that designed the WD-40 crosshair, provided a declaration. He swore that he had never heard of Sorensen, Van Patten, the Inhibitor product line, or the crosshair mark, and that none of these were considered when ECHO designed the WD-40 crosshair.

Additional testimony was given by WD-40's Senior Vice President of North American Sales, Peter Andrew Dumiak. He testified that, prior to this litigation, he was not aware of Sorensen or his companies, products, or trademarks. He also testified that WD-40 products are sold through various channels, including big box stores such as Home Depot, Lowe's, and Menards; "mass" stores such as Walmart and Target; "club" stores such as Costco and Sam's; automotive stores such as Autozone and Pep Boys; hardware stores such as Ace and True Value; and through industrial distributors

such as Fastenal and Grainger. WD-40 also sells to government agencies such as Armed Forces Information Services ("AFIS") and the Defense Commissary Agency ("DeCA"), which provide the products through military commissaries. Dumiak also testified that WD-40 does not sell directly to fishing and hunting stores such as Bass Pro Shop and Cabela's, but agreed that there could be WD-40 products in those stores if a distributor provided them to the stores.

Brady Lamb, WD-40's brand manager for the Specialist line, testified that an earlier WD-40 product, the "3-In-One No Rust Shield" (since discontinued) was advertised in hunting and fishing magazines, and was promoted at the Shooting, Hunting, Outdoor Trade Show ("SHOT" show) in 2010. Sorensen also claims that WD-40 exhibited this product at the show in 2009, when Sorensen promoted his own products there, though WD-40 denies this. WD-40 says it no longer targets hunting and fishing enthusiasts.

Eric Vander Weit testified that he worked for Sorensen in multiple capacities between approximately 1996 and 2001. He has maintained a personal relationship with Sorensen since then. On July 25, 2012, Sorensen called Vander Weit and asked him to go to Menards and see if Vander Weit could find WD-40 Specialist products. When asked if he thought the products were made by Sorensen the first time he saw them, Vander Weit said he thought that the presence of the crosshair indicated that Sorensen "was doing co-branding with WD-40," but he agreed that the products' brand was clearly WD-40.

Sorensen filed this lawsuit against WD-40, alleging trademark infringement of his THE INHIBITOR word mark; false designation of origin with respect to WD-40's use of a

crosshair mark, both standing alone and in combination with the word "inhibitor;" and related state claims under Illinois common law and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 501/1 *et seq*. The district court granted summary judgment in favor of WD-40 on all counts. First, the court held that WD-40's use of the word "inhibitor" on its Long-Term Corrosion Inhibitor product is a descriptive fair use of the term. Second, it held that there were no genuine issues of material fact as to whether WD-40's use of its crosshair mark is confusingly similar to Sorensen's crosshair mark. Finally, because Sorensen's state claims all require a likelihood of confusion, the district court granted summary judgment to WD-40 on those claims as well.

## II. Discussion

We review a district court's grant of summary judgment de novo. *Tindle v. Pulte Home Corp.*, 607 F.3d 494, 495 (7th Cir. 2010). Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing the district court's summary judgment order, we view all facts and draw all inferences in the light most favorable to Sorensen. *See Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). Summary judgment was appropriate if, on the evidence presented, no reasonable juror could return a verdict in Sorensen's favor. *See id*.

## A. Descriptive fair use

The district court found that no reasonable jury could conclude that WD-40 is liable for infringing Sorensen's THE INHIBITOR word mark because WD-40's use of the word "inhibitor" in the name of its Long-Term Corrosion Inhibitor is a descriptive fair use of the word. Under 15 U.S.C. § 1115(b)(4), a defendant in a trademark infringement action may invoke the fair use defense by demonstrating that the alleged infringement "is a use, otherwise than as a mark … which is descriptive of and used fairly and in good faith only to describe the goods or services of such party." This defense "is based on the principle that no one should be able to appropriate descriptive language through trademark registration." *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 639 (7th Cir. 2001). The hypothetical producer of "Crunchy" brand potato chips, for example, cannot block its competitors from describing their chips as crunchy. It may, though, be able to block its competitors from selling chips that are *branded* "Crunchy."

To prevail on a fair use defense, a defendant must show that: (1) it did not use the mark as a trademark; (2) the use is descriptive of its goods or services; and (3) it used the mark fairly and in good faith. *Id*. The fair use defense is available even against federally registered trademarks that are incontestable, such as Sorensen's THE INHIBITOR mark. *Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055, 1058 (7th Cir. 1995).

### i. Non-trademark use

"A word or phrase functions as a trademark when it is used by a source of a product to identify itself to the public

as the source of its product and to create in the public consciousness an awareness of the uniqueness of the source and of its products." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 953 (7th Cir. 1992) (internal quotation marks omitted).

In finding that there was no genuine factual dispute that WD-40's use of "inhibitor" was a non-trademark use, the district court reasoned that the word could not function as a source indicator because the Long-Term Corrosion Inhibitor bottle also displays the famous WD-40 shield, and it is the shield that serves as the source indicator for customers. That reasoning is in some tension with our analysis in *Sands, Taylor & Wood Co.* There, the defendant—the producer of Gatorade—argued that the words "Thirst Aid" could not function as a trademark because they were used in conjunction with the well-known "Gatorade" mark. *Id*. We disagreed, noting that, in the related context of determining likelihood of confusion, "some courts have observed that the conjunction of defendant's trademark and the allegedly infringed term 'may actually increase the misappropriation by linking defendant's name to plaintiff's goodwill.'" *Id*. at 954 (quoting *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 492 (2d Cir. 1988)). "Clearly, then," we held, "the fact that the Gatorade trademark always appears in Quaker's 'Thirst Aid' advertisements does not preclude a finding that those advertisements also use 'Thirst Aid' as a trademark." *Id*.

Moreover, the district court's reasoning rested on the premise that a given product can only contain *one* indicator of source. That, we know, is incorrect—WD-40's Specialist products contain at least three registered trademarks: the WD-40 shield, the word mark "Specialist," and the WD-40

crosshair mark. The fact that the WD-40 shield serves as a source indicator, therefore, does not mean that the word "inhibitor" does not also serve to indicate the product's source.

The district court supported its conclusion in three other ways that we think are worth mentioning. First, it pointed out that WD-40 did not use the words "the inhibitor" on its product, but rather just the word "inhibitor." This fact, however, goes to whether Sorensen's trademark was *infringed*, not whether WD-40 used the word as a mark. Had WD-40 called its product "Inhibitor" and placed that word in large, bold letters on its can, we think it probable that a jury would find that to be trademark use, despite the lack of the word "the." Whether that trademark use infringed upon *Sorensen's* mark would be a separate question. Next, the district court, citing to *McCarthy on Trademarks*, noted that there are competing products on the market that also use the word "inhibitor" to describe their products. But, as McCarthy makes clear, the use of a term by other sellers of similar goods is an indicia of the *descriptiveness* of the term, not of its being used in a non-trademark manner. *See* 2 *McCarthy on Trademarks and Unfair Competition* § 11:20 (4th ed.). In *Sands, Taylor & Wood Co.*, we cautioned against conflating these two elements of the fair use defense. 978 F.2d at 954. Descriptive terms, after all, are protectable as a trademark if they have developed secondary meaning. *See id*. Finally, the district court said that the fact that WD-40 uses the word "inhibitor" on only one of its Specialist line of products, rather than on every product in the line, is an indicia that the word is not being used as a mark. That is partially correct: Sorensen's argument would be much stronger if "inhibitor" appeared on all of the products in the Specialist line. However, a mark

that is used on only one product within a larger line can nevertheless be a source indicator, not for the whole line, but for *that* product in particular. For example, Gatorade, which we mentioned above, has a line of "Gatorade Frost" energy drinks, in five different flavors. The names of two of those flavors—"Glacier Freeze" and "Glacier Cherry"—are registered as separate trademarks. *See* GLACIER FREEZE, Registration No. 2,098,324; GLACIER CHERRY, Registration No. 4,401,610.

Nonetheless, we agree with the district court's ultimate conclusion that WD-40's use of the word "inhibitor" is a non-trademark use. Simply put, we believe that no reasonable juror looking at a bottle of Long-Term Corrosion Inhibitor could conclude that the word is used as an indicator of source. Compared to other features in the bottle's design, the word "inhibitor" is much less prominent or noticeable. It is much smaller than the bright and eye-catching WD-40 shield. It is also smaller than the stylized and colored word "Specialist" and the colorful crosshair mark. Finally, the word "inhibitor"—which is written in relatively small, white type—is less attention-grabbing than even the word "Corrosion," which is larger and colored in orange. Due to the word's small size, plain color, and non-privileged placement on the bottle, we find that "inhibitor" is not an "attention-getting symbol," and does not function as a source indicator. *See Sands, Taylor & Wood Co.*, 978 F.2d at 954 (quoting 1 *McCarthy*, *supra* § 11:17, at 476 (1991 Supp.)).

Sorensen argues in response that WD-40's communications guide requires that employees and advertisements only refer to the product at issue as "WD-40 Specialist Long-Term Corrosion Inhibitor;" no shorter name is acceptable. We do

not agree with Sorensen that this fact is relevant. He seems to suggest that, because the word "inhibitor" must be included whenever WD-40 mentions the product, it must be a trademark. But though the guideline's requirement that the full name be used may suggest that the name *as a whole* is an indicator of source, it does not mean that each individual word in the name serves as a mark. We doubt that Sorensen would argue that the word "term" is a trademark for WD-40's product.

### ii. Descriptive of the product

A descriptive term ordinarily names a characteristic of a product or service. *H-D Mich., Inc. v. Top Quality Serv., Inc.*, 496 F.3d 755, 759 (7th Cir. 2007). There can be no dispute here that the word "inhibitor," following the word "corrosion," describes a characteristic of WD-40's product, which contains VCI and is meant to inhibit corrosion for a long period of time. Multiple competing products made by third parties use the word "inhibitor" to describe their products, and WD-40 uses the word multiple times on its bottle in a manner that is clearly non-source identifying.

Sorensen offers little resistance to this aspect of the district court's opinion, though he does argue that the word "inhibitor" is suggestive rather than merely descriptive because it requires "some operation of the imagination" to make the connection between the term "inhibitor" and a rust preventative oil product. *G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 996 (7th Cir. 1989). We disagree, but, regardless, this framing of the issue is incorrect. The WD-40 product is called a "Corrosion Inhibitor," not just an "Inhibitor." It takes no operation of the imagination to

make a connection between the term "Corrosion Inhibitor" and a product that inhibits rust and other forms of corrosion.

Sorensen points to the case *Fortune Dynamic, Inc. v. Victoria's Secret*, 618 F.3d 1025, 1035 (9th Cir. 2010), in which the Ninth Circuit held that a jury—and not a judge on summary judgment—should decide whether the trademarked term DELICIOUS was being used in a descriptive sense. "Delicious," of course—like "inhibitor"—seems like an inherently descriptive word, which would seem to make for an easy case for the judge on summary judgment. But the key to *Fortune Dynamic* was that the word "Delicious" was a trademark for women's shoes, and not for a food or beverage. *Id*. at 1029. Whether or not a term is descriptive depends not only on the term itself, but also on the product for which it serves as a source indicator. "Corrosion Inhibitor," for example, is clearly descriptive of WD-40's VCI spray; if it appeared on a t-shirt, though, our conclusion very well might be different.

### iii. Bad faith

Finally, the proponent of a fair use defense must show that it used the plaintiff's mark fairly and in good faith. Sorensen's primary argument regarding this element is that the evidence shows that WD-40 had knowledge of Sorensen, his products, and his THE INHIBITOR word mark when it decided upon the name of its Long-Term Corrosion Inhibitor. Given that WD-40 had this knowledge, Sorensen argues, a jury could infer that WD-40 included the word "inhibitor" in a bad-faith attempt to siphon off business from Sorensen.

The district court concluded that there was no evidence that WD-40 had knowledge of Sorensen's product and word

mark, but we disagree. There are multiple documents in the record which were in WD-40's possession and which specifically reference Sorensen and his mark. The district court discounted the relevance of these documents, finding that there is no evidence that WD-40's *marketing department*, the entity that decided upon the name "Long-Term Corrosion Inhibitor," was provided with these documents or had any awareness of Sorensen's mark. Many people at the company, though, clearly did have this information, and a jury could reasonably infer that the marketing department—or at least someone with final decision-making authority—had this knowledge as well.

WD-40's mere knowledge of Sorensen's mark, however, is insufficient to establish that WD-40 acted in bad faith. *Packman*, 267 F.3d at 642. To survive summary judgment, a plaintiff must point to something more that suggests subjective bad faith; Sorensen has not done so here. *See id*. All Sorensen can point to is the fact that WD-40 conducted no trademark search prior to using the word "inhibitor" on its product. A failure to investigate can, in some circumstances, support an inference of bad faith. *See Fortune Dynamic*, 618 F.3d at 1043. In this case, however, this fact cannot help Sorensen survive summary judgment. First, if WD-40 believed—correctly, as we have concluded—that it was not using the word "inhibitor" as a trademark, it had no reason to conduct a trademark search. Second, and more fundamentally, Sorensen's complaint that WD-40 failed to undertake a trademark search is inconsistent with his theory that WD-40 *knew* about his mark, and decided to copy it anyway. Because WD-40 already knew that Sorensen owned a trademark for THE INHIBITOR, a trademark search would have been useless.

Other than pointing to WD-40's mere knowledge of Sorensen's mark, Sorensen has identified no evidence that it acted in subjective bad faith. Because WD-40's use of the word "inhibitor" was also a non-trademark, descriptive use, we therefore agree with the district court's conclusion that WD-40 is entitled to summary judgment on its fair use defense with regard to Sorensen's word mark claims.

**B. Likelihood of confusion**

Having concluded that Sorensen's claims regarding his word mark are barred by the descriptive fair use defense, we are left with his claim that WD-40's use of a crosshair logo on its Specialist products infringes upon Sorensen's common law crosshair trademark.[2] The district court granted summary judgment to WD-40 on these claims, finding that no reasonable jury could find a likelihood of confusion.

"The 'keystone' of trademark infringement is 'likelihood of confusion' as to source, affiliation, connection or sponsorship of goods or services among the relevant class of customers and potential customers." *Sands, Taylor & Wood Co.*, 978 F.2d at 957. "To decide whether there is a likelihood of confusion … a court must ask whether consumers, and specifically consumers who would use either product, would be likely to attribute them to a single source." *Bd. of Regents of Univ. of Wis. Sys. v. Phx. Int'l Software, Inc.*, 653 F.3d 448, 455 (7th Cir. 2011). Possible confusion is not enough; rather, confusion must be "probable." 4 *McCarthy*, *supra* § 23:3. Likelihood of confusion is a question of fact, usually reserved for the jury. *Bd. of Regents*, 653 F.3d at 452.

---

[2] For the purposes of this analysis, we assume without deciding that Sorensen's crosshair mark is valid and protectable.

This circuit uses the following seven factors to determine the likelihood of confusion: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of consistent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any evidence of actual confusion; and (7) the intent of the defendant to "palm off" his product as that of another. *Id*. at 454. No single factor is dispositive, but we have said that three are especially important: the similarity of the marks, the intent of the defendant, and evidence of actual confusion. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 898 (7th Cir. 2001). A court may grant summary judgment even if there is a genuine issue of material fact as to one or more of the seven factors, as long as no reasonable jury, looking at the seven factors as a whole, could conclude that there is a likelihood of confusion. *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir. 1993).

### i. Similarity between the marks

"To determine whether two marks are similar, we view the marks as a whole." *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008). Important to this case, "[w]e must compare the marks in light of what happens in the marketplace and not merely by looking at the two marks side-by-side." *Id*. at 930 (internal quotation marks omitted). "The test is not whether the public would confuse the *marks*, but whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected." *Id*. (quoting *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976)). "[C]omparison of

the *labels* rather than simply the trademarks is appropriate." *Henri's Food Prods. Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 355 (7th Cir. 1983) (emphasis added). "The court should therefore consider whether the customer would believe that the trademark owner sponsored, endorsed, or was otherwise affiliated with the product." *AutoZone*, 543 F.3d at 930 (citation and internal quotation marks omitted).

The central dispute regarding this factor is demonstrated by the differing sets of pictures presented in the parties' briefs. In Sorensen's brief, he shows zoomed-in side-by-side pictures of his crosshair and the burnt orange version of the WD-40 crosshair. From that perspective, there are some basic similarities between the marks—they are both orange with a black border and with various symbols in the quadrants of each crosshair.

But the similarity of the marks analysis does not focus on the appearance of the trademarks in isolation; rather, it looks at the labelling as a whole. The pictures found in WD-40's brief and the district court opinion, which show the entire labels of the products, are therefore much more relevant. We agree with the district court that consumers looking at the entirety of the WD-40 labels would not think that the Specialist products come from the same source as Sorensen's THE INHIBITOR line of products. The WD-40 bottles are primarily black and silver, with a large yellow WD-40 shield and a bright yellow cap. The packaging of Sorensen's products, in contrast, is primarily orange, yellow-orange, and black. Even the appearance of the parties' crosshairs is quite different. WD-40's silver and burnt orange crosshair, with silver symbols shaded to show depth, creates a different impression than Sorensen's bright orange-and-black crosshair,

which features two-dimensional symbols that are silhouettes. The relative size of the crosshairs on the labels is different, as is their placement—on the few "The Inhibitor" products which contain Sorensen's crosshair, it most commonly appears as the "O" in "Inhibitor," not as a freestanding mark near the bottom of the bottle, like on the Specialist products. Simply put, the overall commercial impression of the two bottles is quite distinct.

We have also previously stated that the prominent display of a well-known trademark—such as WD-40's shield—along with an allegedly infringing mark is a strong indication that there is no likelihood of confusion. *Packman*, 267 F.3d at 645. Sorensen argues that such a presumption should not exist. First, he contends that this presumption essentially gives companies with strong marks *carte blanche* to infringe on weaker senior user's marks.[3] Trademark law, though, exists primarily to protect *consumers*, not only the holder of the trademark. *See, e.g., Henri's Food Prods.*, 717 F.2d at 365 ("Indeed the underlying purpose of trademark law is to prevent confusion."). If the holder of a strong mark such as WD-40 puts its mark on one of its products, consumers will not be confused—they will correctly surmise the source of the product. Moreover, there is a remedy for the evil that Sorensen identifies—a reverse confusion claim, which Sorensen has not made here. *See Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 484 (7th Cir. 2007) (explaining the concept of reverse confusion, in which "a junior uses its size and market penetration to overwhelm the senior, but small-

---

[3] The "senior user" of a mark is the first entity to use the mark—here, Sorensen. The "junior user" is a subsequent user of the mark—here, allegedly, WD-40.

er, user," and which exists to "protect[] the senior user's control of its mark and the goodwill created by the mark from a junior user's employment of the mark, and protects the public from being deceived into believing that the senior user's product emanates from, is connected to, or is sponsored by the junior user").

Second, Sorensen argues that, even if consumers will know that WD-40 is *a* source of the Specialist products, WD-40's use of Sorensen's mark will confuse consumers into thinking that his company is *also* a source—in other words, that the companies worked together to co-produce the product. By fooling consumers in this way, WD-40 could improperly benefit from Sorensen's goodwill, and consumers may be harmed if they see Sorensen's crosshair mark as an indicator of quality but accidentally purchase a Specialist product instead. Sorensen points to our case *International Kennel Club of Chicago., Inc. v. Mighty Star, Inc.*, in which we endorsed the proposition that the presence of a junior user's house mark might not always prevent a consumer from "mistakenly assuming that [a senior user] is somehow associated with [a junior user] or has consented to the mark's use." 846 F.2d 1079, 1088 (7th Cir. 1988) (quoting *Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 876 (2d Cir. 1986)). In that case, however, the senior user's mark was much stronger than the junior user's, lending credibility to the theory that the junior user was trying to feed off of the senior user's goodwill.

In contrast, we have considered multiple cases in which the presence of the junior user's famous mark has been sufficient to dispel confusion. In *Packman*, the presence of the Chicago Tribune mark on each page of a newspaper edition

which used plaintiff's "Joy of Six" mark dispelled consumer confusion. 267 F.3d at 645. And, in *G. Heileman Brewing Co.*, we held that the defendant's use of the strong Anheuser-Busch mark in juxtaposition with a "category descriptor" mark—"LA," meaning "low alcohol"—dispelled any likelihood of confusion. 873 F.2d at 1000.

The lesson of these cases is that although the use of an especially strong house mark can greatly lessen the likelihood of confusion, it may not wholly eliminate the possibility that consumers will believe a product to be cross-branded. In determining the extent of this possible confusion, we must make two comparisons. First, we must compare the strength of the junior user's house mark to the senior user's mark that is allegedly being appropriated. A consumer is more likely to think of cross-branding where the senior mark is well known; after all, if the consumer has never heard of the senior user, cross-branding will not come to mind. Here the WD-40 mark is very strong, while, as we detail below, Sorensen's crosshair mark is quite weak. This makes it unlikely that a consumer will think that the WD-40 product is cross-branded with Sorensen's line. The second relevant comparison is between the senior user's mark and the image that appears on the junior user's product. If cross-branding were indeed occurring, the junior user would likely use an exact copy of the senior user's mark, and probably the name of the senior user's product as well. Here, though, as we concluded previously, the WD-40 crosshair is quite different from Sorensen's. Moreover, if the product *were* cross-branded, it would not just contain this crosshair, since that is a relatively weak source of Sorensen's product. Rather, it would probably feature Sorensen's stylized THE INHIBITOR logo, with either the crosshair or a bull's eye in

the place of the "O." If cross-branding were occurring, the junior user would seek to make it as clear as possible; it would not use a significantly different form of a seldom-used logo. Altogether, we think that that no consumer would think that the Specialist products were co-branded by Sorensen.

### ii. Similarity of the products

The relevant inquiry with respect to the similarity of the products factor is not whether the products are interchangeable, but whether the products are the kind the public might very well attribute to a single source. *Autozone*, 543 F.3d at 931. The district court found that this factor supports WD-40, but we disagree. Two of the products at issue—Sorensen's V80 VCI blend and WD-40's Long-Term Corrosion Inhibitor—are functionally identical. So, at the very least, this factor supports Sorensen with regard to whether WD-40 infringes his trademark by using its crosshair logo on that product in particular.

Looking at the parties' product lines as a whole, the district court concluded that the products in Sorensen's line and the Specialist products are not the type that the public might attribute to a single source. Sorensen's line of products includes oil, grease, poly bags, wiping clothes, plugs, paper, and pro chips, all of which contain VCI. The Specialist products, with one exception, are all sprays that come in aerosol cans; only one contains VCI. We think, however, that consumers might very well expect Sorensen, as the producer of rust-preventive products, to expand his product line into the types of sprays included in the Specialist line. *See id.* ("The rights of an owner of a registered trademark extend to any goods or services that, in the minds of consumers, might be

put out by a single producer."). The fact that Sorensen's current products all contain VCI is minimally relevant; WD-40's line demonstrates that the same producer sometimes manufactures both products that do and do not contain VCI. It also seems eminently possible that WD-40 might expand its Specialist line into the products produced by Sorensen. WD-40 already makes a rust-preventing spray containing VCI. It would not be surprising for the company to start producing other VCI-containing rust-preventive materials. Again, the contents of Sorensen's product line demonstrate that companies sometimes produce both VCI spray and other VCI-containing materials.

WD-40 points to a case, *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1045 (7th Cir. 2000), in which we said that, in considering this factor in the context of restaurants, courts should consider the restaurants' "ambiances and themes." In other words, we said that two restaurants are not necessarily similar products just because they are both restaurants. In the context of this case, WD-40 suggests that its Specialist products are different than Sorensen's because they have a different "ambiance"—the "WD-40 ambiance"—due to the presence of the WD-40 shield. It further suggests that its products have different "themes"—essentially, colors—than Sorensen's.

This argument misses the mark entirely. It is obvious that two restaurants can be so dissimilar as to be essentially different products. A Michelin-starred French restaurant is wholly different from a Chinese take-out restaurant.[4] Con-

---

[4] The restaurants in *Barbeque Marx* were admittedly not as dissimilar as those in our hypothetical. Both were barbeque restaurants. The plaintiff's restaurant, however, was small, decorated in a 1950s style, and focused

sumers, moreover, would not expect the owner of one of these restaurants to branch into the other's part of the market. A restaurant's ambiance and themes are part of its product, because visiting a restaurant is a service experience. The products at issue in our case, in contrast, do not have themes or ambiance—they only have branding. The colors and designs found on the outside of an aerosol can are not the product. It is circular to look at products' branding—in other words, their trademarks—to consider, for trademark infringement purposes, whether two products are similar. Products that come in spray bottles can of course be very different—window cleaner is not the same as spray paint. But that's because of what is inside the bottle, not what is printed on the outside. We therefore find that this factor favors Sorensen.

### iii. Area and manner of concurrent use

In considering this factor, courts look at "whether there is a relationship in use, promotion, distribution or sales between the goods or services of the parties." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 681 (7th Cir. 2001). We also look to whether the parties use the same channels of commerce, target the same general audience, or use similar marketing procedures. *Id*. at 681–82.

This factor generally provides little support for Sorensen. He presents no concrete evidence that WD-40's products and

---

on blues music. The defendant's, in contrast, "style[d] itself as an 'irreverent' restaurant, using … sexually charged slogans," and had a very different interior feel than plaintiff's restaurant. But, as we note above, even these relatively minor differences had to do with the parties' *products*, not merely with their branding.

his own products have ever been sold next to each other, that they target the same consumers, that they have ever been advertised through the same channels, or that the products were both shown at the same trade show in the same year.

Sorensen does, however, provide some evidence from which a jury could make limited inferences in his favor. It is undisputed that Sorensen and WD-40 both sell products at Menards, though the products are currently sold in different sections and Sorensen's VCI oils and sprays—the products most similar to WD-40's—are not sold at Menards. So, while a consumer may encounter both parties' products while in the same store, he will not see them both simultaneously. Though Sorensen's products are not sold at big box or mass stores other than Menards, a jury could infer that both his and WD-40's Specialist products are sold at smaller hardware stores such as Ace. And, though there is no evidence that WD-40 specifically markets to Sorensen's target audience—hunters and fishermen—that is somewhat beside the point, as WD-40 effectively targets *all* consumers. Sorensen also specifically targets members of the military. WD-40 argues that it does not, but a jury could infer that it does through its sale of its products to AFIS and DeCA, which in turn supply military commissaries.

Even making all inferences in Sorensen's favor, as we must at this stage, this factor only weakly supports Sorensen.

### iv. Degree of care exercised by consumers

Generally, courts considering this factor assume that "[t]he more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases."

*Id*. at 683. When customers use a lesser degree of care, this supports a finding that there is a likelihood of confusion.

Both Sorensen's and WD-40's products are quite inexpensive (under $12), and could even be characterized as impulse purchases. The district court held that this factor tended to support Sorensen, and we agree. WD-40 argues that consumers searching for its famous shield—which appears on its Specialist products—take much greater care in purchasing to ensure that they are indeed choosing the correct product. That may be true, but it is irrelevant to this case, in which Sorensen alleges that WD-40 is infringing *his* trademark. The consumers relevant to our likelihood of confusion inquiry are not those who go to the store seeking to buy WD-40 products. Rather we are interested in those customers who seek to buy *Sorensen's* products (or are undecided about what to buy), and are potentially misled into buying a Specialist product. That fact that WD-40's brand may be strong does not influence how careful these customers are likely to be. WD-40 points to a number of our cases in which we have stated that the existence of a well-known mark can lead consumers to exercise a higher degree of care. *See, e.g., Barbecue Marx*, 235 F.3d at 1045. In each of those cases, however, the famous mark belonged to the *plaintiff*; the strength of the plaintiff's mark meant that consumers searching for the plaintiff's good or service were likely to take more care to ensure that they chose correctly. Here, though, the situation is reversed, and the relevant consumers are unlikely to exercise a great deal of care. This factor, therefore, weighs in Sorensen's favor.

### v. Strength of Sorensen's mark

"The 'strength' of a trademark refers to the mark's distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source." *CAE*, 267 F.3d at 684. "The stronger the mark, the more likely it is that encroachment on it will produce confusion." *AutoZone*, 543 F.3d at 933. A mark's strength ordinarily corresponds to its economic and marketing strength. *Id*.

Sorensen has presented little evidence demonstrating the strength of his crosshair mark. Though there is evidence that Sorensen has included the crosshair mark in advertising since the late 1990s, he has offered no consumer surveys or testimony regarding the public's awareness of the mark, or sales data showing that products bearing the mark are so widely sold that a jury could infer that many consumers are aware of the mark. Most damaging to Sorensen's argument regarding this factor is his inconsistent use of the crosshair mark. Inconsistent use makes a symbol less helpful to consumers as a source indicator, and therefore a weaker mark. Sorensen's crosshair has been used since 1997, but inconsistently—sometimes the crosshair has symbols in each quadrant, sometimes the quadrants are empty, and many times there is no crosshair at all, but rather a bull's eye. This factor therefore squarely supports WD-40.

### vi. Evidence of actual confusion

Sorensen admits that he does not have any evidence of actual confusion. As he correctly points out, however, evidence of actual confusion is not required to prove that a likelihood of confusion exists. *CAE*, 267 F.3d at 686.

### vii. Bad faith intent

This factor focuses on evidence that the defendant is attempting to pass off its product as having come from the plaintiff. *Packman*, 267 F.3d at 644. Mere knowledge of someone else's mark is insufficient to show intent to pass off. *Barbeque Marx*, 235 F.3d at 1046. We above concluded that there is enough evidence for a jury to infer that WD-40 knew about Sorensen's products and his THE INHIBITOR word mark; we come to the same conclusion regarding his crosshair mark. Just as with the word mark, however, we find that Sorensen has presented no evidence that WD-40 attempted to pass off its products as Sorensen's. There is no evidence that ECHO, the firm that first designed the WD-40 crosshair, had any knowledge of Sorensen's mark. It seems highly unlikely, therefore, that, after ECHO came up with the design on its own, WD-40 chose it because it hoped to siphon off sales from Sorensen. Furthermore, the fact that the WD-40 shield appears on the Specialist products tends to suggest a lack of bad faith—why include this well-known mark if WD-40 was attempting to confuse consumers into thinking that the product was *not* produced by WD-40, but rather by Sorensen.

Though a reasonable jury could find that WD-40 knew about Sorensen's crosshair mark when it adopted its own crosshair design, it could not reasonably conclude that it copied the mark in bad faith. This factor therefore supports WD-40.

*       *       *

We agree with the district court that summary judgment was appropriate in this case. Although, as noted above, a

number of the likelihood of confusion factors provide support for Sorensen, that is not enough to create a material dispute of fact that must be presented to a jury. *AHP*, 1 F.3d at 616. Rather, the relevant question is whether, looking at the seven factors collectively, a reasonable jury could find in Sorensen's favor. The three most important factors—similarity of the marks, bad faith intent, and evidence of actual confusion—all point decisively in favor of WD-40. Particularly important is the dissimilarity of the marks; because we conclude that no consumer would think that the marks are similar, we cannot imagine any consumer being confused. Also central to our conclusion is the clear weakness of Sorensen's marks, which appear only rarely and inconsistently on his products. Weighed together, the seven factors show no disputed issue of material fact that must be preserved for the jury.

### III. Conclusion

We AFFIRM the judgment of the district court.