In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 06-2009

CUSTOM VEHICLES, INC.,

*Plaintiff-Appellant*,

*v.*

FOREST RIVER, INC.,

*Defendant-Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:04 CV 771—**Robert L. Miller, Jr.**, *Chief Judge.*

_____

ARGUED DECEMBER 8, 2006—DECIDED FEBRUARY 7, 2007

_____

Before EASTERBROOK, *Chief Judge*, and POSNER and RIPPLE, *Circuit Judges*.

POSNER, *Circuit Judge*. Custom Vehicles sued Forest River for trademark infringement, lost on summary judgment, and appeals. In 1999 Custom (actually a predecessor, but we can ignore that detail) had created a product that it called "Work-N-Play." It was a van the interior of which could be converted by the owner in about an hour from a mobile office to a camper, or vice versa, so that he could, in Custom Vehicles' words, "work out of it through the week" and "play out of it on the weekends." Hence the name, which Custom Vehicles first registered with the

Patent and Trademark Office in 2000 as an "intent to use" trademark—meaning that it would be used in commerce, in a sense we explain later in this opinion, within six months. 15 U.S.C. §§ 1051(b), (d); *WarnerVision Entertainment Inc. v. Empire of Carolina, Inc.*, 101 F.3d 259, 260 (2d Cir. 1996).

Custom Vehicles sold its first van—though not under the "Work-N-Play" name—that year. The following year Forest River, a much larger company, decided to build a towed van with a ramp door at the back and space inside for a repair shop so that the van's owner could both transport his motorcycle or snowmobile and repair it without taking it to a repair shop. Vans of this sort are called "toy trailers," because motorcycles, snowmobiles, and the like are referred to by aficionados as "adult toys." Forest River called its new product "Work and Play," a name as apt to its dual use as to Custom Vehicles'.

Forest River began selling the vans in 2002, and by 2004 their annual sales exceeded $10 million. Meanwhile, Custom Vehicles sold only one other "Work-N-Play" van—its demo model, which it sold to a family member of Custom Vehicles' owner for $1,000—until 2004, when it sold six more vans. Those were its first bona fide sales of vans under the "Work-N-Play" mark, since its first sale had not been under that name and the second sale, to a relative for roughly 2.5 percent of the van's normal sales price, was not a commercially meaningful sale.

Both Custom Vehicles and Forest River promoted their respective products at recreational-vehicle trade shows. We may assume without having to decide that the products are sufficiently alike that if "Work-N-Play" is a valid trademark, Forest River's use of "Work and Play" as the name of its van is potentially infringing, though even

if the trademark is valid, Custom Vehicles, to prevail in an infringement suit, would have to prove that Forest River's use of it would be likely to deceive or confuse. 15 U.S.C. § 1114(1)(a); *Sullivan v. CBS Corp.*, 385 F.3d 772, 775-77 (7th Cir. 2004); 4 Thomas J. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:1 (4th ed. 1996).

"Work-N-Play" is what in trademark law is called a "descriptive" mark. That is, it does more than merely name a brand; it describes the product category to which the brand belongs (so Maxwell House is a brand, coffee the product), in this case vans usable both for work and for play. "Holiday Inn," "All Bran," and "American Girl" are familiar examples of descriptive marks. A descriptive mark is not a complete description, obviously, but it picks out a product characteristic that figures prominently in the consumer's decision whether to buy the product or service in question.

A seller must not be permitted to appropriate as the name of its brand a term by which the public knows the product category to which the brand belongs, for that would make it difficult for other sellers of the same product to describe their brands, and this would impair competition. Hence a descriptive mark cannot be registered, 15 U.S.C. 1052(e); *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 193-94 (1985); *Mil-Mar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153, 1157 (7th Cir. 1996)—with an important exception. In time, a term that originally was descriptive may come to signify to consumers a single brand. A new product may require a descriptive name to introduce consumers to it, but if the product catches on, the name may come to be uniquely associated with the original seller, and another term may come into use to describe the product. For example, "All Bran" came to mean not any all-

bran cereal but a particular brand of all-bran cereal. Once this happens, the term can be appropriated as a trademark because it has come to denote a single brand, not the entire product, so that its use by other sellers of the product would confuse consumers about the source of what they were buying. In trademark parlance the descriptive mark will have acquired "secondary meaning" and now can be enforced against sellers that use the term or a confusingly similar variant. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., supra*, 469 U.S. at 194; *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 988 (7th Cir. 2004); *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 609 (7th Cir. 1986); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9-10 (2d Cir. 1976); see 15 U.S.C. § 1052(f).

So until and unless "Work-N-Play" achieved secondary meaning as the name of Custom Vehicles' product, it could not be a legally protected trademark. And even if it could be, its use by another firm would not infringe because, unless Custom Vehicles' descriptive mark had achieved secondary meaning, a consumer would not associate the name with Custom Vehicles and so could not be confused if someone else used the name. 2 *McCarthy on Trademarks and Unfair Competition, supra*, § 15:11. "[I]f there is no secondary meaning, there is no mark to protect and confusion is not possible." *Id.*

Forest River could in that event, by dint of heavy advertising and a large sales volume, acquire secondary meaning for *its* use of the name first chosen by Custom Vehicles. This is the case of "reverse passing off," where, as we explained in *Peaceable Planet, Inc. v. Ty, Inc., supra*, 362 F.3d at 987, "the plaintiff complains that the defendant is trying to pass off the plaintiff's product as the defendant's," perhaps in order "to obliterate the plaintiff's

corporate identity and prevent him from entering new markets, where the defendant, having appropriated the plaintiff's trademark, would claim that the plaintiff was the infringer." Another name for this phenomenon is "reverse confusion," which "exists when a junior user uses its size and market penetration to overwhelm the senior, but smaller, user. The 'senior user' [that would be Custom Vehicles in this case] is the first to adopt and use a mark anywhere in the country. The 'junior user' [Forest River in this case] is the second user, regardless of whether it adopts and uses a mark in a geographically remote location. Reverse confusion doctrine protects the senior user's control of its mark and the goodwill created by the mark from a junior user's employment of the mark, and protects the public from being deceived into believing that the senior user's product emanates from, is connected to, or is sponsored by the junior user." *Lucent Information Management, Inc. v. Lucent Technologies, Inc.*, 186 F.3d 311, 316 (3d Cir. 1999). That may have happened in the present case—prospective buyers who approached Custom Vehicles at recreational-vehicle trade shows thought when they saw the "Work-N-Play" brand name that Custom Vehicles was affiliated with Forest River.

But Forest River's swamping of Custom Vehicles' marketing efforts infringes only if "Work-N-Play" is a legally protected trademark; and it is difficult, maybe impossible, for a small seller of an unpopular brand—a seller who has negligible sales—to acquire secondary meaning for its brand name. Such a seller is better off adopting a fanciful or arbitrary mark, which is enforceable without proof of secondary meaning. When Forest River launched its "Work and Play" van in 2002, Custom Vehicles' predecessor had made only one commercial

sale, and that sale wasn't even made under the name "Work-N-Play." Few consumers could have thought that "Work and Play" designated Custom Vehicles' brand rather than an indefinitely larger set of products usable for both work and recreation.

We acknowledge that the difficulty of obtaining secondary meaning in a mark equally descriptive of a range of products made by established firms may create a dilemma for the producer of a genuinely novel product. As we noted earlier, a descriptive mark will facilitate introducing a new product to the public, and so it is a natural choice for a start-up, but if he adopts such a mark he may find himself drowned out, as may have happened to Custom Vehicles. However, a product that is genuinely novel will be sheltered from competition (to a degree anyway) by patent or trade secret law, or more commonly just by the headstart created by its being first in the market; and so it will not be drowned out by a product sold by a larger competitor. Custom Vehicles' basic problem is that the only novel feature of its van—that it can be used as both a mobile office and a recreational vehicle—did not satisfy a large pent-up demand that, had it materialized, might have conferred secondary meaning on Custom Vehicles' mark before anyone else could get in on the act. Furthermore, the someone else was not a competitor—Forest River was seeking to satisfy a different consumer demand. There was and is nothing to prevent Custom Vehicles from adopting a new mark, even a new descriptive mark—such as "Office-N-Rec"— that might acquire secondary meaning. Its "Work-N-Play" mark, however, described too much.

Having insufficient evidence to demonstrate secondary meaning, Custom Vehicles falls back on its registered

trademark, noting that such a trademark, like a patent, carries a presumption of validity. 15 U.S.C. § 1115(a); *CAE, Inc. v. Clean Air Engineering, Inc*., 267 F.3d 660, 672-73 (7th Cir. 2001). In the case of a registered descriptive mark, therefore, the presumption is that it has acquired secondary meaning. *Packman v. Chicago Tribune Co*., 267 F.3d 628, 638-39 (7th Cir. 2001). But the act of registration merely begins the process that leads to the presumption. Bare registration is not enough. Trademarks cannot be "banked" or "warehoused"—that is, you cannot register thousands of names, unrelated to any product or service that you sell, in the hope of extracting a license fee from sellers of products or services for which one of your names might be apt. Cf. *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214 (4th Cir. 2002). You must certify that the product is in use in commerce—defined as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark," 15 U.S.C. § 1127—within six months after the trademark was registered. 15 U.S.C. § 1051(d). Within those six months Custom Vehicles sold a grand total of one van, and the trademark was not used in the sale. Even if it had been, that would not have been enough to place the trademark in the "ordinary course of trade." *Lucent Information Management, Inc. v. Lucent Technologies, Inc*., *supra*, 186 F.3d at 315-17.

We suppose that one sale of a $150 million airplane or yacht within the first six months might be sufficient use, see 3 *McCarthy on Trademarks and Unfair Competition*, *supra*, § 19:110, for it would be enough to seize the attention of the relevant market. See *General Healthcare Ltd. v. Qashat*, 364 F.3d 332, 334-35 (1st Cir. 2004); *New England Duplicating Co. v. Mendes*, 190 F.2d 415, 418 (1st Cir. 1951). But not one

sale of a van. That sale would have been too obscure an event to alert any significant number of consumers that "Work-N-Play" had a definite referent (even if the name had been used in the sale); and until that happens, the creator of the mark should not be able to appropriate it. For such a practice, by creating a trademark thicket, would make it difficult for new producers to find suitable names for their products that had not already been appropriated to no worthier end than providing the premise for an infringement suit.

We acknowledge that *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1157 (9th Cir. 2001), holds that "where a mark has been placed on goods, a single sale or shipment may be sufficient to support an application to register the mark, providing that this shipment or sale has the color of a bona fide transaction and is accompanied or followed by activities which would tend to indicate a continuing effort or intent to continue such use and place the product on the market on a commercial scale within a time demonstrated to be reasonable in the particular trade." But the court derived this wordy formula (what is "the color" of a "bona fide transaction"?) from *Hydro-Dynamics, Inc. v. George Putnam & Co.*, 811 F.2d 1470, 1472-74 (Fed. Cir. 1987), a case decided before Congress in 1989 amended the trademark law to require that to be entitled to the presumption of validity a trademark must be used in the "ordinary course of trade." Unless, as in our yacht example, the product is unusually expensive, a single sale, followed by frenetic but futile efforts to make a second sale, hardly justifies allowing the seller to appropriate the mark, denying its use to sellers who can actually sell.

The formula is especially inapt to a descriptive mark, for without significant sales (always excepting the case of

the superexpensive prototype) the mark could not achieve secondary meaning. Cf. *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 562-65 (2d Cir. 1990). This is critical, because the presumption of validity that registration creates is easily rebuttable, since it merely shifts the burden of production to the alleged infringer. *Door Systems, Inc. v. Pro-Line Door Systems, Inc.*, 83 F.3d 169, 172 (7th Cir. 1996); *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 604 (9th Cir. 2005); *Retail Services, Inc. v. Freebies Publishing*, 364 F.3d 535, 542 (4th Cir. 2004). Exclusive use of such a mark, in contrast to exclusive use of a fanciful mark, such as "Exxon" (that is, a made-up word), or of an arbitrary mark, such as "Apple Computer" (arbitrary because a computer has nothing to do with an apple), or even of a suggestive mark, such as "Mr. Clean" or "Gleam Toothpaste" (suggestive because it calls to mind some attribute of the products), can, as we said, by appropriating the term by which consumers know the product space in which the sellers compete, impair competition by impeding the ability of competitors to indicate that their brands are in the same product space. Even if Custom Vehicles' registration were in force, it would not overcome the overwhelming evidence that "Work-N-Play" never became associated in consumers' minds with Custom Vehicles' vans to the exclusion of other dual-use vans. See, e.g., *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 93-94 (4th Cir. 1997); *PaperCutter, Inc. v. Fay's Drug Co., supra*, 900 F.2d at 562-65.

In the absence of registration, a producer can still obtain relief by proving that the defendant is using a mark that "is likely to cause confusion . . . as to the origin, sponsorship or approval of his or her goods." Lanham Act, § 43(a), 15 U.S.C. § 1125(a); *Wal-Mart Stores, Inc. v. Samara Bros.,*

*Inc.*, 529 U.S. 205, 209 (2000); 5 *McCarthy on Trademarks and Unfair Competition*, *supra*, § 27:14. But as we said earlier, without proof of secondary meaning there is no basis for thinking a descriptive mark the name of a brand—no basis therefore for supposing that consumers would think Forest River's van "Work and Play" had been produced by Custom Vehicles instead.

AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*